## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**JENNIFER COULTER**                                                                    **PLAINTIFF**

**V.**                                    **CASE NO. 5:19-CV-05077**

**NORTHPORT HEALTH SERVICES
OF ARKANSAS, LLC**                                                                    **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

Now pending before the Court are Defendant Northport Health Services of
Arkansas, LLC's ("Northport") Motion to Dismiss (Doc. 14), which the Court construes as
a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c);
Plaintiff Jennifer Coulter's Response in Opposition (Doc. 17); and Northport's Reply (Doc.
18). On August 21, 2019, the Court held a hearing on the Motion, and the parties were
afforded an opportunity to present oral argument. At the close of the hearing, the Court
**GRANTED** the Motion from the bench. The following Memorandum Opinion and Order
sets forth in greater detail the reasons for the Court's decision. To the extent this Order
differs from what was stated from the bench, this Order will control.

## I. BACKGROUND

The case was originally filed in the Circuit Court of Washington County, Arkansas.
Northport removed the case to this Court on April 17, 2019. Plaintiff Coulter alleges
employment discrimination on the basis of gender pursuant to the Arkansas Civil Rights
Act ("ACRA"), which courts have determined should be interpreted consistently with Title
VII of the Civil Rights Act. See Crone v. United Parcel Serv., Inc., 301 F.3d 942, 945 (8th
Cir. 2002) ("The Arkansas Supreme Court looks to decisions interpreting the federal civil
rights laws in analyzing gender discrimination claims under the Arkansas Civil Rights

1

Act."); *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 615 (8th Cir. 2000) ("Claims premised under the Arkansas Civil Rights Act of 1993 are analyzed in the same manner as Title VII claims.").

The basis for the Court's federal subject matter jurisdiction is complete diversity of citizenship, as Coulter is an Arkansas citizen, Northport is a limited liability company composed of members that are citizens of states other than Arkansas, and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. The Complaint (Doc. 3) recounts how Coulter was hired by Northport to serve as Regional Admissions Coordinator for the Arkansas Region in mid-October of 2017, and she began working for Northport on October 30, 2017. Northport is a company that operates long-term care facilities in Alabama, Arkansas, Florida, and Missouri. In Arkansas alone, Northport operates several long-term care facilities in and around Northwest Arkansas and the River Valley, and Coulter, as part of her job duties, was obligated to travel not only to facilities in Northwest Arkansas, where she resided, but also to other facilities farther away, including those in Fort Smith and Paris, Arkansas. She did so much driving as part of her job that she claims she put 25,000-28,000 miles on her company vehicle during the ten months she worked for Northport.

The Complaint maintains that Coulter and her employer had no issues during the first nine months of her job. Coulter did well, and she was never disciplined. However, around August 1, 2018, Coulter was informed that her job responsibilities were changing, and she was instructed to start her day in the Paris facility by 8:00 am and work there until 5:00 p.m., three days a week. On Monday, August 6, she complained to her supervisor, Regional Director of Operations Jeremy Green, "that she was experiencing

2

stress related to the new requirement for her to be in Paris three days a week." *Id.* at ¶ 21. She now had to leave her home by 6:00 a.m. each day she worked in Paris and did not return home until around 7:00 p.m. She explained to Green that she was a single mother trying to work out the logistics of having a job that now involved more extensive and time-consuming travel and a thirteen-hour work day, and balancing those commitments with before-school and after-school childcare, feeding her children dinner, and attending extra-curricular evening activities. She told him working out all this "was going to be challenging." *Id.* Green told her, "Don't panic or stress about it, we will work it out, I can be there a few days a week also." *Id.*

In that same conversation with Green, Coulter mentioned to him "that her eight-year-old had Back to School Open House from 4-5 pm on Thursday (8/9/18) evening and asked if she could attend." *Id.* at ¶ 22. Green told her to spend the afternoon marketing in the Fort Smith area so she would be closer to home and could attend the open house.

On August 8, Coulter worked in Paris from 8:00 a.m. to 5:00 p.m. Then, on Thursday, August 9, the day of the school open house, she spent the day in the Paris facility from 8:00 a.m. to 2:30 p.m. The COO of the company, Robert Sprague, was at the Paris facility that day. Coulter mentioned to him that she would be "out on the field" marketing that afternoon, and then would attend an open house at her child's school. Sprague remarked, "I didn't know you had children," and asked, "How old are they?" *Id.* at ¶ 24.

The following day, August 10, Coulter spent the day in Paris. Sprague was there again, and he did not tell her that her job performance was deficient. Several days later, on August 14, Coulter again worked in Paris. When she got home at 7:00 p.m. that

3

evening, Green called her and told her to report to the facility in Springdale the next day. When she showed up in Springdale, she was terminated. She claims that Green opened the discussion of her termination with the following statement: "Because of your children and family situation, we don't feel this is a good fit." Id. at ¶ 28. Coulter's replacement was a woman with no school-aged children. Id. at ¶ 31.

According to Coulter, these facts state a plausible claim that she was the victim of sex discrimination stemming from "the perceived and real responsibilities of a single mother." Id. at ¶ 32. She contends that Northport violated her civil rights under the ACRA by discriminating against her "based on gender and her responsibilities as a single mother of school-aged children." Id. at ¶ 33.

Northport argues in its motion that Coulter's gender discrimination claim should be dismissed. She stated in her Complaint that her supervisor told her the reason why she was being terminated was because her "children and family situation" was "not a good fit" for the demands of the job. Northport maintains that the facts surrounding her employment and termination do not indicate that she suffered gender discrimination in the workplace or that gender-based animus motivated her firing. The law is clear that firing someone due to their familial status or caregiving responsibilities does not violate Title VII (or the ACRA). See Phillips v. Martin Marietta Corp., 400 U.S. 542, 544 (1971).

Under the familiar McDonnell Douglas framework,[1] a prima facie case of gender discrimination requires proof that: (1) the plaintiff was a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) facts exist that give rise to an inference of unlawful gender discrimination. Wells v. SCI

[1] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

4

*Mgmt., L.P.*, 469 F.3d 697, 700 (8th Cir. 2006). Here, Northport focuses on the first and fourth prongs of the prima facie test, arguing that familial status is not a protected class and that Coulter has failed to state facts that would plausibly show she was terminated because of her gender and not for any other legal reason.

Coulter responds that her Complaint is one for gender discrimination based on sex stereotyping. Specifically, she argues that Northport fired her because she is a single mother, and Northport's all-male management team believed that female workers like herself cannot simultaneously work a job and care for their children. The Court pressed Coulter's counsel at the hearing as to whether Northport's assumptions about work and caregiving obligations were specific to mothers—and, therefore, gender based—or else were directed more generally to parents or caregivers. Counsel responded by suggesting that Northport's use of the phrase "family situation"—though seemingly gender-neutral— was really "coded or veiled language for 'because you're a single mother.'" When the Court again pressed counsel on this same point—that the facts in the Complaint did not indicate bias or stereotyping based on motherhood—counsel responded that "there will need to be additional evidence to survive the summary judgment motion later . . . but at this point there is enough to go forward . . . . [and] I think that there can be an inference of discrimination drawn from her employer specifically identifying her as a female with caregiving responsibilities."

## II.  LEGAL STANDARD

Although Northport styles its motion as one to dismiss for failure to state a claim under Rule 12(b)(6), it is more properly construed as a motion for judgment on the pleadings under Rule 12(c), as Northport filed an answer prior to filing its motion. *See*

Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cr. 1990) ("Technically . . . a Rule 12(b)(6) motion cannot be filed after an answer has been submitted."). The distinction between a motion for judgment on the pleadings and a motion to dismiss "is purely formal, because we review [a] 12(c) motion under the standard that governs 12(b)(6) motions." Id.

To survive a motion for judgment on the pleadings, the plaintiff must present "a short and plain statement of the claim that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The intention of this is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93 (2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In evaluating the sufficiency of the complaint, a reviewing court assumes that "all factual allegations in the pleadings are true and interpret[s] them in the light most favorable to the nonmoving party." Bell v. Pfizer, Inc., 716 F.3d 1087, 1091 (8th Cir. 2013) (internal quotation omitted).

Even so, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

## III. DISCUSSION

For the reasons explained at the hearing, the Court finds that the facts, as pleaded, do not state a claim for gender discrimination—and in particular, illegal sex stereotyping, as Coulter contends. Sex stereotyping due to false assumptions about mothers and their capabilities as workers has been recognized as a form of illegal discrimination under Title

VII. In *Chadwick v. WellPoint, Inc.*, the First Circuit explained that "an employer is not free to assume that a woman, because she is a woman, will necessarily be a poor worker because of family responsibilities." 561 F.3d 38, 44-45 (1st Cir. 2009). However, Coulter's Complaint contains no facts that indicate she was terminated due to false assumptions, or stereotypes, relating to her gender. Further, the Complaint is devoid of any allegation that Coulter's supervisors—or even co-workers—made inappropriate gender-based remarks during the course of her employment or otherwise engaged in gender-specific, disparate treatment.

Quite to the contrary, the facts in the Complaint demonstrate that Coulter had no problems with her employer until August of 2018, about nine months after she started working for Northport. The problems started after her supervisors asked her to report three times a week to a facility that was farther from Coulter's home. This change in her work responsibilities altered her commuting time significantly. She complained to her supervisor that this change created stress for her with respect to her caregiving responsibilities at home, and it was shortly thereafter that she was fired due to lack of a "good fit" with the job. Though the words her supervisor uttered to justify her firing were not directed to her responsibilities as a *mother* and did not indicate illegal sex stereotyping of *mothers* as workers, Coulter tries to save her case from dismissal by arguing that the gender-neutral justification was really "coded or veiled language" for something more nefarious. The Court is unpersuaded by this argument.

Coulter recently sought leave to file an amended complaint, *see* Doc. 19. However, the proposed pleading does not alter any of the facts regarding Coulter's sex stereotyping claim in the original Complaint. The only substantive change concerning the

ACRA claim is the addition of the following paragraph:

> 32. Further, in its Reply to Plaintiff's Response to Motion for Judgment on the Pleadings, Defendant asserts that she was terminated because "she could not be present at facilities within her region as directed," after "leaving work several hours early to attend an open house at one of her children's schools." *See Reply, Document 18.*

*Id.* at 7. This paragraph of facts contains information lifted from Northport's reply to the motion. The new facts, however, do not help Coulter state a plausible claim for illegal sex stereotyping, at least sufficient to survive *Iqbal* and *Twombly*'s heightened pleading standards. The new paragraph of facts merely reasserts that Northport fired Coulter for gender-neutral reasons, namely, because "she could not be present at facilities within her region as directed" and because she left work "several hours early to attend an open house." Accordingly, the Complaint merits dismissal pursuant to Rule 12(c).

## IV. CONCLUSION

**IT IS ORDERED** that the Complaint is **DISMISSED WITHOUT PREJUDICE** pursuant to Federal Rule of Civil Procedure 12(c). The Clerk of Court is directed not to close the case, as the Court granted Plaintiff leave to file an amended complaint to assert new claims for failure to pay overtime compensation under the Fair Labor Standards Act and the Arkansas Minimum Wage Act by no later than September 11, 2019.

**IT IS SO ORDERED** on this **27**day of August, 2019.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE